UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

```
UNITED STATES OF AMERICA,      )
                               )      2:04-cr-0065-GEB
                 Plaintiff,    )
                               )
     v.                        )
                               )
BILLY SOUTHERLAND,             )      RULE 32 SENTENCING ORDER
                               )
                 Defendant.    )
                               )
```

The following findings address the parties' dispute over findings in the Presentence Report ("PSR").

AMOUNT OF LOSS

The government and Defendant each object to the $640,000 amount of loss finding in the PSR. The government argues the loss amount "should be at least $1,000,000," which is "computed as the total amount taken by the defendant based on false statements to customers who did not get their vehicles moved and to whom the defendant failed to return their money." (Gov't Obj. to PSR filed 7/22/05 ("Gov't Obj.") at 7-8.) The government contends this estimated loss amount is based upon Defendant's fraud scheme, in which several victims paid Defendant's car transport business to transport a vehicle which was not transported.

1

Specifically, the government argues in its Objection to the PSR:

> Evidence at trial showed that during the year 2003 (from December 18, 2002 through November 30, 2003, the defendant had 3,659 customers who paid money to the defendant. The evidence was that the defendant always charged a $200 fee minimum. A reasonable estimate of the number of victims for 2002 would be to use the number of victims for 2003, or 3,659. At $200 per customer, the total estimated loss for 2002 would be $731,800.
>
> ***
>
> Therefore, a reasonable estimate for both years would be the 2003 figure above ($812,488), plus the 2002 figure above ($731,800), for a total for both years of $1,544,288.
>
> If the loss amount is over $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), 16 levels should be added.

(Gov't Obj. at 9-10).

The government filed a supplemental brief on August 7, 2005, in which it argues:

> The government asks the Court to determine the loss amount to be either $604,585, or $1,544,288. Either figure is for money paid by customers to the defendant for moving their vehicles, for which the defendant failed to move the vehicles and failed to refund the $200 deposit he took from them.
>
> The figure $604,585 is the amount of money taken according to the defendant's own computer records for the period of December 2002, through November of 2003, as testified to by Dr. Melody Stapleton. Although this figure does not include the entire relevant period of conviction, it is evidence which was introduced at trial based on the defendant's records.
>
> The figure $1,544,288 is the government's offer to the Court for a reasonable estimate

2

> for roughly the period of indictment, 2002 and 2003.

(Gov't Supplemental P.&.A.s Re Sentencing filed 8/7/05 ("Gov't Supp. Br.") at 5.)

Defendant argues in his objection to the PSR that the loss figure is based on facts that increase Defendant's sentence beyond what is authorized by the jury verdict. (Def.'s Obj. to PSR filed 7/25/05 ("Def.'s Obj.") at 17.) Defendant contends that, based on the jury's special verdict, the amount of loss is $945.00. (Id. at 19.) Defendant argues he requested the special verdict so he could "obtain a jury determination of all the factual issues essential to judgment." (Id.)

The government appears to argue that the amount of loss calculation encompasses all victims involved with Defendant's scheme to defraud, and that the scheme in this case "involved thousands of victims" and "had taken place from December 28, 2001 and continued to January 29, 2004." (Gov't Supp. Br. at 2-3.) Defendant counters that the government's position is legally unsupported because it is tantamount to "argu[ing] that the nature of the fraud 'does not matter'" when determining the amount of loss. (Def.'s Resp. to Gov't Supp. Br. filed 8/8/05 ("Def.'s Resp.") at 2.) Defendant contends since "the government . . . pursued a 'false statement' theory [of fraud liability] the fraud must be defined as that encompassed in the jury verdicts: it must be defined by the false statements" in "the counts of conviction." (Id. at 4.)

Prior to Defendant's sentencing hearing held August 9, 2005, a tentative ruling on the amount of loss issued in which

3

the scheme to defraud was defined by the false statement found by the jury in convicting Defendant of Count 4.  The focus of the first element of the jury instruction for this count is the existence of "a scheme to defraud or obtain money by making false . . . statements. . . ."  (Jury Ins. No. 15.)  "'It is not the making of the false [statement] that constitutes the first element of the offense,' . . . '[i]t is the devising or intending to devise the scheme.'"  United States v. Kennedy, 64 F.3d 1465, 1475 (10th Cir. 1995) (citation omitted).

When the jury convicted Defendant of Count 4, it found that he engaged in a fraudulent scheme of obtaining money by falsely stating in promotion of his company on the Internet: "We have a great on-time record of pick-up and deliveries!!  Superior performance with a fail rate of 2% or less in most areas!!"[1] (See Trial Ex. 4-1; see also Verdict, Count 4, in which the jury stated: "False statement– Percentage of fail rate false– Exhibit 4.1.")  Defendant also used a similar success rate statement on a website in March 2002 and in oral communications and writings from this date through November 2003.[2]  Thus, Defendant engaged

---

[1] Trial Exhibit 4-1 reveals this statement was on Defendant's website on November 7, 2003.  Based upon the trial record, the reasonable inference is drawn that this representation and other similar representations were made during the applicable time period as part of Defendant's scheme to obtain money.

[2] On March 9, 2002, Defendant wrote in an email to a victim: "If you have chosen the discount rate it means that pick-up is on next available carrier/truck with space. Your date of pick-up is certainly what is important and is performed in 95% of these orders."  (Trial Ex. 5-1.)  On October 17, 2002, a disgruntled victim inquired of Defendant's company in an email: "Can you please let me know if I'm in the 99% on-time delivery
(continued...)

4

in a scheme to obtain money by making false statements to potential customers about his company's success rate ("scheme"). Defendant made these false statements regardless of whether he could transport a customer's vehicle as represented.[3] This is indicated, *inter alia*, in the trial testimony of one of Defendant's customers, who testified that Defendant told him in response to an inquiry about when his car would be transported: "listen, you f---ing [expletive], I've already got your money." This scheme will be the basis for assessing the amount of loss for purposes of Defendant's sentencing.

> Under the guideline which applies to fraud, the offense level is calculated by adding

---

[2](...continued) you advertise on your website?" (Trial Ex. 2-4.) On November 29, 2003, a victim wrote in a letter to Defendant's company: "I was told by both Molly and Sonya that there was a 98% probability that the car would be picked up on the scheduled dates." (Trial Ex. 4-4.) Further, in Defendant's company's letter response to the Better Business Bureau concerning customer complaints about the company's failure to transport vehicles as represented, the company's general manager states, "We . . . have less than 2% failure rate. That leaves a 98% success rate." (See, e.g., Trial Ex. 27-3, 27-4, and 27-5 (where this representation was made in letters dated August 18, September 10, and October 2, 2003).)

[3] "[T]wo interrelated but separate offenses" are identified in 18 U.S.C. § 1341: the offense of "(1) engaging in a scheme or artifice to defraud, or (2) engaging in a scheme to obtain money or property by false or fraudulent pretenses." United States v. Haber, 251 F.3d 881, 888 (10th Cir. 2001). "[A] scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result. A scheme to obtain money by false or fraudulent pretenses, representations, or promises, on the other hand, focuses on the *means* by which money was obtained." Id. at n.3 (quotation marks and citation omitted). Here, Defendant's false statements about his company's success rate were the means by which he obtained money from customers.

>           points (based upon the amount of the loss) to
>           the base offense level of six.  As the loss
>           increases, so do the points.

United States v. Blitz, 151 F.3d 1002, 1009 (9th Cir. 1998) (citation omitted).

The loss ascribed to the scheme must bear a reasonable "relation to the amount of loss the defendant actually inflicted or intended to inflict."  United States v. Riley, 143 F.3d 1289, 1291 (9th Cir. 1998).

>           [S]entencing courts should use the loss the
>           defendant attempted to inflict, if the
>           intended loss can be determined and is
>           greater than the actual loss.
>
>                           ***
>
>           [T]here exists no rigid formula for the
>           sentencing court to follow in attempting to
>           determine the victim's loss in fraud cases
>           when the amount of neither actual nor
>           intended loss is readily apparent.  Nor is
>           the district court obligated to search for
>           the perfect theoretical or statistical
>           fit. . . .   [T]he district court's obligation
>           is to adopt a reasonable "realistic,
>           economic" projection of loss based on the
>           evidence presented. As noted in the fraud
>           guideline, "the loss need not be determined
>           with precision"; rather, "[t]he court need
>           only make a reasonable estimate of the loss,
>           given the available information." [4]

United States v. W. Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001) (citation omitted.)

Related "conduct which was part of [Defendant's] scheme is counted [in the loss amount], even though the defendant was

---

[4] "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, Cmt. n.3(A)(i).  "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id., Cmt. n.3(A)(iv).

not convicted of crimes based upon the related conduct." <u>United States v. Fine</u>, 975 F.2d 596, 600 (9th Cir. 1992); <u>United States v. Rogers</u>, 321 F.3d 1226, 1231 (9th Cir. 2003) (stating "the district court [must] consider the entire loss caused by the fraudulent scheme, and the loss is not limited by the counts of conviction."). "The factual findings underlying the relevant conduct enhancement generally must be supported by a preponderance of the evidence." <u>United States v. Munoz</u>, 233 F.3d 1117, 1126 (9th Cir. 2000). However, "a sentencing factor that has an extremely disproportionate effect on the sentence may require a district court to find that factor by clear and convincing evidence, rather than by a preponderance of the evidence." <u>Id.</u> at 1126-27.

It is difficult to determine the precise loss wreaked from Defendant's scheme. However, the trial evidence makes pellucid that from December 18, 2002, through November 30, 2003, Defendant used his scheme to obtain $604,585 from customers who did not ultimately get their vehicles transported, and whose money was not refunded.[5] (Trial Ex. 37-5.)

---

[5] The government argues Defendant's customers from the year 2002 should also be included in the loss determination. Defendant counters that his failure rate that year does not justify the inclusion. (Def.'s Resp. at 7.) The time period is limited as stated above, even though it probably does not represent the total loss, since the clear and convincing evidence standard is utilized and the government has not shown that the record substantiates its loss position for that portion of 2002 not included in the period stated above.

Further, this actual loss figure is used instead of intended loss since the use of either loss methodology for the period at issue adds the same points to Defendant's offense level – it is evident that between December 18, 2002, and November 30, 2003, through his scheme, Defendant intended to obtain, at a minimum,
(continued...)

1    Defendant disagrees with this assessment of loss, and
2 argued during the August 9 sentencing hearing "there is evidence
3 in this case that witnesses who in fact did contract with
4 Mr. Southerland didn't believe . . . everything they read anyway"
5 so those customers are not true victims "of a material
6 false statement which is the nature of the underlying criminal
7 conduct."

8    "[A]lthough money or property must be the object of the
9 scheme, the government is not required to show that the intended
10 victim was actually defrauded.  The government need only show
11 that the defendant[] contemplated some actual harm or injury."
12 United States v. Wallach, 935 F.2d 445, 461 (2d Cir. 1991)
13 (internal citation omitted).

> Nothing in the mail and wire fraud statutes
> requires that the party deprived of money or
> property be the same party who is actually
> deceived.  The phrase "scheme or artifice
> . . . for obtaining money or property by
> means of false or fraudulent pretenses,
> representations, or promises," 18 U.S.C.
> § 1341, is broad enough to include a wide
> variety of deceptions intended to deprive
> another of money or property. . . .  We see
> no reason to read into the statutes an
> invariable requirement that the person
> deceived be the same person deprived of the
> money or property by the fraud.

United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998).

   Since mail fraud is a crime against the United States,

---

[5](...continued)
$200 from thousands of customers.  Therefore, at a minimum, Defendant's intended loss was $439,400 ($200 multiplied by the number of victims during that time period who paid a $200 deposit to Defendant but did not get their vehicles transported and did not receive a refund).  (Ex. 3 to Gov't Obj.)

8

"'the persons communicated with through the mails are only important to identify and show the scheme.'" <u>United States v. Dreer</u>, 457 F.2d 31, 33 (3d Cir. 1972); <u>cf.</u> <u>United States v. Brewer</u>, 528 F.2d 492, 497 (4th Cir. 1975) (indicating it is of no consequence that Defendant's use of the mails did not involve sending a letter to a victim, "for the victim need not be the recipient of the material that is mailed").  Therefore, the victims who suffered a loss by paying money to Defendant to transport their vehicles and whose vehicles were not transported and whose money was not refunded need not have been exposed to Defendant's fraudulent success rate representation to be victims of Defendant's scheme.  Through his scheme, Defendant contemplated harm to all potential customers, and ultimately, Defendant's scheme resulted in the loss of money to thousands of victims.  The loss to those victims was reasonably foreseeable since Defendant knew, or under the circumstances, should have known, that it was a potential result of his scheme. Therefore, a reasonable estimate of the amount of loss is $604,585.

## OBSTRUCTION OF JUSTICE

Defendant further objects to the obstruction of justice enhancement.  This objection is sustained since it is unclear whether the enhancement is sustainable based on the record under the applicable perjury standard.

## NUMBER OF VICTIMS

Defendant's objection against the finding in the PSR in paragraph 22 is overruled since thousands of Defendant's customers were victimized by his criminal scheme.

ROLE IN OFFENSE

Defendant also objects to the two offense level enhancement for his role in the offense. (See PSR ¶ 23.) Defendant argues this enhancement is inappropriate since "there is no evidence any other persons were criminally responsible for the commission of the offenses of conviction." (Def.'s Obj. at 26.)

This objection is overruled. Trial testimony supports the finding that Defendant was the head of his vehicle moving business and the record reveals that Defendant's subordinates looked to him as the source for how they were to communicate with customers; Defendant was able to hear some of his subordinates' business communications from an office on the business premises, where he had a speaker system that enabled him to hear what they said to customers. Defendant and certain of his subordinates made fraudulent representations about the business's success rate. Subordinates of Defendant also made the same fraudulent representation to the Better Business Bureau in response to numerous customer complaints. Defendant and certain of his subordinates also engaged in "bait and switch" tactics with several customers involving first quoting a low vehicle transport fee to them and then, after that low fee failed to result in the vehicle being transported, they would in essence tell customers that the customers could just wait to see if the vehicle eventually got moved or, alternatively, the customers could pay more money to get their vehicle transported. These communications were made under circumstances that evinced it was obvious that the initial vehicle transport price was too low, and

it was known that the company's successful vehicle transport rate was poor.  Thus, these subordinates were aware of Defendant's scheme and were criminally responsible for a crime of which he was convicted.

For the stated reasons, Defendant's offense level is 26 and his Guideline range is 70 to 87 months' imprisonment.

MISCELLANEOUS OBJECTIONS

1. Defendant's objections to the terms "market rate" and "bait and switch" in paragraph 5 are overruled.

2. Defendant's objections to paragraphs 6 and 7 are overruled.

3. Defendant's objection to the portion of paragraph 8 concerning more complaints having been filed against Defendant's business than any other business, and the portions of paragraph 10 concerning checks are noted, but no finding concerning them is necessary, because the controverted matters would not affect guideline computation and will not be taken into account in sentencing.

4. Defendant's objection to the words "roughly half" in paragraph 11 is noted, but no finding concerning them is necessary, because the controverted words would not affect guideline computation and will not be taken into account in sentencing.  This does not mean, however, that no percentage will be considered in lieu of the stated percentage.

5. Defendant's objection to the portion of paragraph 30 concerning his membership in a gang is noted, but no finding concerning it is necessary, because the controverted

11

1 matter would not affect guideline computation and will not be
2 taken into account in sentencing.
3       6. Defendant's objections to paragraphs 41, 42, 43, 46,
4 and 50-56 are overruled.
5       Pursuant to Federal Rule of Criminal Procedure
6 32(i)(3)(C), the Clerk of Court is to serve a copy of this Order
7 on the Probation Office, which shall insure that this Order is
8 appended to and accompanies any copy of the PSR made available to
9 the Bureau of Prisons. See United States v. Turner, 898 F.2d
10 705, 709 n.2 (9th Cir. 1990).
11       IT IS SO ORDERED.
12 Dated: August 15, 2005

                        /s/ Garland E. Burrell, Jr.
                        GARLAND E. BURRELL, JR.
                        United States District Judge