UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 2:04-cr-0065 GEB |
| Plaintiff, ) | |
| ) | |
| v.  ) | ORDER |
| ) | |
| BILLY D. SOUTHERLAND, ) | |
| ) | |
| Defendant. ) | |

Pending is Defendant Billy D. Southerland's ("Southerland") motion for "an order staying the imprisonment portion of his sentence pending the Ninth Circuit's decision on his appeal from the district court's orders, judgment and sentence in this case."  (Mot. at 1.)  A tentative ruling on the motion was filed on September 8, 2005, followed by a hearing on September 9, 2005.  The question, then and now, is whether there is "clear and convincing evidence that [Southerland] is not likely to flee or pose a danger to any other person or the community."  18 U.S.C. § 3143(b)(1)(A).

The government contends that Southerland poses an economic danger to the community and a risk of flight.  Southerland contends that he is not a danger to the community and not likely to flee. Southerland further argues that an electronic or global positioning

1

system (GPS) device could be used as a condition of his release to ensure he does not flee.

## DISCUSSION

### I. Economic Danger to the Community

The record reveals that Southerland could pose an economic danger to the community if released. Southerland's apparent obliviousness at his sentencing to the criminal activities underlying the guilty verdict coupled with his complete lack of remorse and proclamations of innocence indicate that he is not averse to engaging in the type of criminal behavior again.[1] Notwithstanding his likely recidivism, it is unlikely Southerland will pose an economic danger to the community if released since it should be feasible to fashion reasonable conditions that mitigate against the threat of economic danger he poses.

### II. Likely to Flee

#### A. Flight Risk

The factors enumerated in 18 U.S.C. § 3142(g) to be considered when assessing the risk of flight include: (1) the nature and circumstances of the charges and counts of conviction, (2) the weight of the evidence against the defendant, and (3) defendant's history and personal characteristics.

##### 1. The Nature and Circumstances of Charges and Counts of Conviction

Southerland was convicted of mail fraud. Southerland's scheme to defraud involved thousands of victims who suffered a loss by paying money to Southerland's vehicle moving business to get their

---

[1] These findings are also pertinent to the discussion in section II. A. 3. a. infra.

2

vehicles moved but did not get their vehicles moved.  Southerland obtained from victims a minimum of $200 through a fraudulent representation about his vehicle moving business's movement success rate, which constituted an intended loss of $439,400 ($200 multiplied by the number of victims between December 18, 2002, through November 30, 2003).  (Rule 35 Sentencing Order filed Aug. 15, 2005, at 7-8, n.5.)  After Southerland obtained certain victims' money, his behavior toward them was obnoxious, obscene and insulting.  This factor weighs against release.

        2.   <u>The Weight of the Evidence</u>

Substantial questions are involved with determination of the amount of loss, which if resolved in Southerland's favor, would result in a sentence less than the sixty-seven month prison sentence Southerland received.  This factor weighs in favor of release.

        3.   <u>History and Personal Characteristics</u>

            a.   <u>Character</u>

The jury verdict, which convicted Southerland of three felony counts of fraud, and the trial record shed light on Southerland's personal character.  The trial testimony revealed that Southerland was verbally abusive when communicating with some of his customers during telephone conversations, and that this abuse at times included name calling, use of expletives, and rudely hanging up on some of his customers.

In addition, the Magistrate Judge's Order filed May 24, 2004, indicates Southerland possesses an abusive character.  Specifically, the Magistrate Judge inferred from "the filing of letters of clarification by [Southerland's wife and daughter] following the hearing" that "neither [the wife nor the daughter] was

3

willing or able to testify regarding . . . defendant's abusive behavior." (May 24 Order at 11-12.) The Magistrate Judge observed that "[t]his unwillingness or inability further suggests defendant exerts some level of intimidation or control over his wife and daughter, however subtle or subconscious." (May 24 Order at n.10.)

b. Past Conduct

The transcript of Southerland's detention hearing held February 4, 2004, reveals that the Magistrate Judge essentially found that Southerland was in the process of trying to flee when law enforcement agents encountered him on his premises, which they were about to search. The transcript reveals when Southerland was then encountered, "the house was packed, the car was packed, and there was a passport and $12,000 cash in [a safe located in a] truck." (Tr. at 4, 23.) The Magistrate Judge also observed that "according to the government, there's a minimum of a million dollars missing here. . ." and that Southerland's action "seems like flight . . . ." (Id. at 12.)

Although it was argued at that detention hearing that Southerland was on his way to Texas, the Magistrate Judge observed, "you don't need a passport to go to Texas." (Id. at 23.) A law enforcement agent told the prosecution at the hearing that at the end of the day on which Southerland's premises was searched, Southerland stated he intended to go to Scotland. (Id. at 24.) The agent related that Southerland said "there's a passport and cash in a safe in the back of the Suburban, I want it." (Id. at 25.) "I'm going to Scotland." (Id.) Southerland's attorney argued Southerland did not tell the agent he was going to Scotland, but Southerland's counsel stated at the end of the hearing that Southerland has been to Scotland

before, "he's Scottish" and Southerland had "a reservation to go to Scotland in June." (Id. at 31, 33.)  Also, the "agents were told by one of the gentlemen that ran [Southerland's] computer system, that Mr. Southerland had said to this person . . . that [he] could run this system from Belize or Scotland." (Id. at 30.)  This computer system, or internet business, was involved with the crimes of which Southerland was convicted. (Id.)

        At a subsequently held detention hearing on March 31, 2004, Southerland submitted misleading information regarding the equity in his residence in Anderson.  Specifically, he submitted a letter from a real estate agent, Ken Murray, as evidence of $150,000 fair market value of the property.  When this letter was submitted to the Court, his property was listed on the Multiple Listings Service through another real estate agent.

        The Magistrate Judge ordered Southerland released on bond at a minimum of $48,000 which would be secured by his Anderson property.  But Southerland failed to tell the Court that he had filed a homestead exemption between the time of ordering a title report and offering the documents to the Court.  The effect of filing the homestead exemption was that there was no available equity, because pursuant to California Civil Procedure Code sections 704.720 and 704.730, upon the sale -- voluntary or by execution -- up to $75,000 of the proceeds from the sale of the property must be paid to the homesteader.  Thus, the equity Southerland offered for his appearance bond appeared to be illusory.

/////
/////
/////

c.  <u>Family Ties</u>

The record is devoid of evidence of family ties evincing that Southerland has relationships with family members "wherein the family members had some control, either physical or emotional, over [Southerland's] action." <u>United States v. Trosper</u>, 809 F.2d 1107, 1110 (5th Cir. 1987). Although Southerland indicated through his attorney at the April 8 hearing that he desires to see his grandchild who was born while he has been incarcerated, this desire does not show the existence of a family relationship likely to dissuade Southerland from fleeing. Since Southerland was in the process of leaving California at the time his premises were searched, he presumably did not have sufficient family ties to dissuade him from leaving the area. And he presumably does not have such ties now.

d.  <u>Financial Resources</u>

Although Southerland argues he lacks the financial resources necessary for flight, the record indicates that his criminal activities involved a large sum of money. It is assumed that Southerland could obtain the funds necessary for flight from some of that money or from close acquaintances.

e.  <u>Criminal History</u>

Southerland's Pretrial Services Report dated February 2, 2004 ("PSR"), revealed Southerland's criminal history. That history includes a 1971 voluntary manslaughter conviction; and a conviction for disturbing the peace for which he was sentenced to one year probation in April 2002.

Further, in light of Southerland's proclamation of his innocence at his sentencing hearing, it is assumed that he has a motive to flee so he could avoid facing approximately thirty-five

6

1  months of additional prison time for business practices found by the
2  jury to be fraudulent but which he opines were legal.  When all
3  aspects of Southerland's history and characteristics are considered,
4  this factor weighs against release.
5          Consideration of all three factors reveals that Southerland
6  is likely to flee if released.
7          B.   Ability of Electronic or GPS Device to Ensure
8               Southerland Does Not Flee
9          Southerland argues that any threat of flight can be
10 eliminated by the use of an electronic or GPS device as a condition of
11 his release.  This argument disregards the limitations of such
12 devices.

>       Conventional electronic monitoring . . . would
>       only apprise authorities of whether Mr.
>       [Southerland] was in or out of his home, and would
>       . . . give him ample lead time if he wished to
>       flee.  See United States v. Townsend, 897 F.2d at
>       994-95 ("Nor does the wearing of an electronic
>       device offer assurance against flight occurring
>       before measures can be taken to prevent a detected
>       departure from the jurisdiction.").

18 United States v. Anderson, ___ F.3d ___, 2005 WL 1910496 at *9 (D.D.C.
19 Mar. 16, 2005).  Further, even the GPS-based monitoring system could
20 be disabled "for a period of time sufficient to allow him to flee."
21 Id.  The testimony of Pretrial Services Officer Phil Davis at the
22 September 9 hearing revealed an additional limitation.  He stated that
23 electronic monitoring is available, but if Defendant elected to flee
24 on a Friday, this flight probably would not be discovered until two or
25 three days afterward.  Mr. Davis indicated that the same detection of
26 flight problem exists with a GPS-based monitoring system.
27 /////
28 /////

CONCLUSION

For the stated reasons, a condition or combination of conditions will not reasonably assure Southerland's appearance as required. Therefore, his motion is denied and he is detained as a flight risk.

IT IS SO ORDERED.

Dated: September 15, 2005

/s/ Garland E. Burrell, Jr.
GARLAND E. BURRELL, JR.
United States District Judge